I'll turn to Judge Stoll for a motion. I move for the admission of Michael J. Blanco, who is a member of the Bar and is in good standing with the Highest Court of Virginia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. I'm particularly pleased to move for Mike's admission today because he's my law clerk. In fact, he's one of my first law clerks. He has consistently demonstrated excellence in his legal work and dedication and passion in his legal work, as well as in his culinary skills in preparing spicy desserts for the annual La Posada celebration, not to mention his wonderful stagecraft skills. He has also brought much joy to our chambers by giving us our first grand clerk, Colin Blanco, who was born a year ago on Valentine's Day. Mike is a kind, hardworking, funny, and dedicated attorney, and I'm sure he will uphold the values of this court. We're delighted to grant your motion, Judge Stoll. Why don't you stand, please? Please raise your right hand. Do you solemnly swear that you will comport yourself as an attorney and counselor of this Constitution of the United States of America? I do. Congratulations. Congratulations. Thank you. The first case for argument this morning is 15-2095, NatQuest v. Lee. Mr. Heinrich, whenever you're ready. May it please the court, Alan Heinrich on behalf of Appellant NatQuest. This is an appeal from a Section 145 action in which the district court granted summary judgment of obviousness to the PTO. In doing so, the district court resolved material factual disputes against NatQuest in violation of Rule 56. The district court rejected the opinions of NatQuest's expert, Dr. Miller, without explanation, and the district court had a wholly conclusory analysis of obviousness. Now, the claims at issue here, they cover the use... Let me ask you a question about the claims, because it may not make any difference, but the claims as quoted in the district court opinion 2026 and 2027 seem to be different than is set forth in the appendix. What's the explanation for that? Frankly, Your Honor, I did not notice that. I believe that the recitation of Claim 20, for example, on page JA5 of the district court's order, I believe that's a correct recitation of the claims at issue here. Well, there's the reference, among other things, to the cell line, which doesn't appear in the claims as set forth in the appendix. But if you don't know the answer to that, please. So the claims here, they claim the use of this cell line, NK92, in the in vivo treatment of a cancer. The NK92 cell line is actually a cancerous cell line of natural killer cells harvested from a particular patient who succumbed to the cancer. So what the claim is claiming here is the sort of paradoxical use of this cancerous cell line in a method of treating cancer in others. So basically your position is that the Miller Declaration creates genuine issue material fact. The Miller Declaration, as well as the 32 additional exhibits that were cited to the district court in this proceeding. And in fact, there are statements in the prior art itself that raise that. So it strikes me that the Miller Declaration, to a significant extent, reads like illegal grief. And everyone knows that lawyers help witnesses write declarations. What exactly is a factual matter is there in the Miller Declaration that should cause us to say that there needs to be a trial here? I look at the Miller Declaration, one of the things that you rely on is the notion that disease. And yet I see the Miller Declaration is resting on an incorrect claim construction in the sense that Miller says that the claims require unmodified cell lines. But that's not correct, is it? So we're not relying on that here, Your Honor. To answer your question, there are two sets of material facts that I want to focus on here. One is whether in vitro data, such as the in vitro data on NK92 in the Gong reference, would have given a person of ordinary skill a reasonable expectation of success that NK92 could be used in an in vivo method of treating a cancer. And we're talking about an allogeneic therapy here. In other words, a therapy where we're using a cell line from a donor in a foreign host. And there are many problems with taking in vitro data and making assumptions about in vivo efficacy, particularly in the circumstances we're talking about here with an allogeneic therapy. Dr. Miller described a number of these difficulties. One is there's a risk of what's called graft versus host disease. Namely, that the NK92 cell line will attack the patient's own cells upon the administration of this therapy. There's another risk that the host cells will attack the NK92 cells. To get into the weeds a little bit on a very specific factual point that Dr. Miller raised, NK cells, natural killer cells at the time, were known to be inhibited by MHC class one. There was a risk, and this was an important part of their function, it was believed. There was a risk that was recognized that if you take a foreign NK cell line, put it into another host, that as a result of the mismatch, the MHC mismatch between the host and the donor, that the NK cells would not, it was thought, respond to inhibitory signals. And as a result, could indiscriminately kill the host cells. This would be an example of... The question is whether they are sufficient to defeat an obviousness finding. And you certainly agree that the NK92 cell was in vitro found to be effective. And you certainly have to agree that other NK cells had been found effective in vivo, right? So certainly Gong shows that the NK92 cell line is cytotoxic against a couple of cancerous cell lines. However... And Vunovich, or however it's pronounced. Vunovich actually says that you can't, it's very difficult to predict... that a particular NK cell line, not NK92, was effective in treating cancer in vivo, right? No, no. The 955 application is the first disclosure of the use of NK cells in any allogeneic therapy. And more than that... I didn't understand that to be true. I thought it was clear that Vunovich had two cell lines in vivo, two NK cell lines in vivo, one of which worked and one of which didn't. No, your honor. This is the first use of an NK cell line in vivo in an allogeneic therapy in the prior art. And in fact, this is the first use of NK cells solely in vivo therapy. There was lack... Look at appendix 961 on the right-hand side in the last paragraph. The significant in vivo antitumor activity in NK, but not any NK cells, blah, blah, blah. I mean, what am I missing? Let me just... So I believe, your honor, that we're talking about here lack cell therapy. I didn't read it that way, and it doesn't say that. Well, so certainly... Okay, so this is... I apologize. This is not an allogeneic therapy. We're talking about the activated NK cells of the patient, and it's not NK92. Well, it's certainly not NK92. And it's also not an allogeneic therapy here, where you're taking a foreign donor's cells and using them in a patient. You're saying this is their own NK cells. This is the patient's own NK cells. It's not the situation where you're taking them from elsewhere and putting them into the patient. Do I have that correct? Correct. So I want to get to a second point of disputed fact here, which is that according to the district court, and the premise of the district court's obviousness analysis is that the NK cells, NK92, and TAL-104 cells were, quote, functionally similar. The district court just was making that... That was his own determination. And it appears that the only basis for that determination was that both NK92 and TAL-104 were broadly cytotoxic in vitro assays. But the district court was looking at this at sort of a 50,000 foot level. Of course, the analysis here has to be from the perspective of a person skilled in the art. And a person skilled in the art would be looking at the very important details that Dr. Miller lays out in his declaration. Dr. Miller discusses the differences between NK92 and TAL-104 with respect to antigen, surface antigen profile, target specificity, signaling pathways. And Dr. Miller states that those differences would have led a person of skill in the art to expect different immune responses and different cytotoxic functionality. So the question... He doesn't say that someone skilled in the art would have thought it wouldn't work, right? He says that a person of skill in the art would have had no basis to have a reasonable expectation of success. The answer to my question is yes. He doesn't say that someone skilled in the art would conclude that it wouldn't work. They would conclude that it wouldn't work? No, but he certainly says that a person of skill in the art would not have had a reasonable expectation of success, that it would work. And that's really the test here. So there are these two important constellations of disputed issues of fact, whether the gone in vitro data was predictive of in vivo results, and whether there were differences between TAL-104 and NK-92 that a person of skill would have recognized. The district court simply had a conclusion that this broad cytotoxic effect renders this combination obvious. The district court simply dismissed, without explanation, Dr. Miller's testimony. The basic question is, how confident do you have to be that it's going to work? I mean, it doesn't have to get to the level of certainty, right? Absolutely not. But there has to be a reasonable expectation of success, and there are simply disputed facts here that that's the case. And then finally, the district court, in assessing this question of reasonable expectation of success, applied an improper claim construction. At JA-22, the district court states that a person of skill in the art would have had a reasonable expectation of success, that NK-92 would lyse one or more cancer cells in vivo. But that's not what the claim requires. The claim recites a method of treating a cancer. That preamble is limiting. But that wasn't his claim construction, right? He had a different claim construction, but your point is that later, when he actually analyzed it, he used the incorrect claim construction. Well, so his claim construction that he recited earlier in his opinion was also incorrect. But it doesn't make any difference, does it? I mean, it's summary judgment. We're not talking about findings of fact. It makes a big difference. There's a big difference between whether... Well, on his finding about whether a person... No findings. It's summary judgment. Well, his conclusion that a person of skill in the art... Well, we're reviewing a de novo. What difference does it make that he might have said something wrong? Well, because it goes to his analysis, Your Honor. But no, you're not answering my question. If it's a de novo review, what difference does it make? Well, it goes to whether his analysis should be affirmed or not. The fact is the claim doesn't require just killing one cancer cell. The question on summary judgment is whether the district court's analysis should be affirmed. The question is whether the result that the district court reached on de novo review should be sustained. So I agree with that, Your Honor. But what the district court concluded here was simply that a person of ordinary skill would have expected that NK-92 could kill just one or more cancer cells in vivo. That's simply an incorrect claim construction. The preamble sets forth the essence of this invention. So I'm going to reserve the rest of my time. You've already used all of your time, but we'll restore two minutes on rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the court. We are here today because Dr. Klingman filed his patent application more than a year after he published his work on NK-92 cells with Dr. Gong. The Gong publication combined with Dr. Santoli's work in TL-104 cells render the claims on appeal unpatentable. To this day, there are only two types of cells that are known to recognize and lyse cancer cells, NK cells and T cells. Therefore, anybody looking to develop an adoptive immunotherapy to develop a cell line to administer to cancer patients to recognize and lyse cancer cells would have looked for a cell line derived from either T cells or NK cells. Dr. Santoli had shown that the TL-104 cell line, both in vivo and in vitro, in vivo in mice and in dogs, had the ability to recognize and lyse cancer cells and actually successfully treat cancers in mice and dogs. As far as in vivo use of NK-92 cells, no, that hadn't been shown prior to filing. What had been shown prior to filing is that NK-92 cells work in vitro and that they work ex vivo. Dr. Klingman also published a prior art abstract showing that NK-92 cells work in ex vivo purging of cancer cells taken from the blood of a cancer patient. I wanted to address specifically your friend's point about dislodging or the incorrect conclusions here on summary judgment given Dr. Miller's report. Why isn't specifically, why isn't Dr. Miller's report sufficient to at least raise a question of fact that would obviate summary judgment? It's not sufficient, first of all, because the points raised are not in dispute and additionally, they're not material. All of the points that Dr. Miller raises, for example, in the reasonable expectation of success about graft versus host disease, those are all related to whether something will be successful in the clinical setting, safe and effective in treating a cancer. The claims here state that treating a cancer is merely the killing, the recognition and lysis of cancer cells. The claims do not require that the cancer, that we see a clinical result and so... But doesn't his affidavit to some extent suggest that the efficacy in vitro can't be translated into in vivo efficacy? We don't dispute that. We don't dispute that everything that works in vitro works in vivo. And the law doesn't require... Doesn't necessarily work. Right. We're not saying that if it works in vitro, it will work in vivo, but the law doesn't require that either. This court has repeatedly said that that isn't required and the PTO regularly will issue a patent on in vivo methods based in certain situations on in vitro use. But in this case, if you look, for example, to the Yann publication, she said, oh, you know, Dr. Santoli showed in vitro and in vivo that these TL104 cells can recognize and lyse cancer cells. So I'm going to do some head-to-head comparison and NK92 cells work in vitro, so I'm going to do head-to-head comparisons to see which one would be really good in an adoptive immunotherapy to test whether NK92 cells will be similarly useful in adoptive immunotherapy. She goes on to say, well, this indicates that it would be. Of course, we need to test this in vivo, but we have indication. This is a contemporaneous study and publication by someone of ordinary skill in the art who said... that NK92 cells would perform in vivo the way that TL104 cells had performed. And this court's case law doesn't require the prior art to have actually tested to make sure that there's in vivo activity. Essentially, what Dr. Miller is saying is that in order to render the claimed invention obvious, the prior art would have to anticipate the claimed invention, that the prior art would need to show, in his own words, that the use of NK92 cells were safe and robust animal models. That's more than Dr. Klingman submitted to the USPTO in order to obtain his patent. That is what he's asking for, this novelty plus. That's not the standard. That's not the legal standard by which this court or the USPTO judges whether there's a reasonable expectation of success. Are you suggesting that the same test exists for patentability, for getting a patent, and for obviousness? In other words, that if based on this accumulation of prior art showing in vitro efficacy, the other efficacy in vivo, these other L cells or whatever they are, if you could get a patent based on that, that would render the claims obvious? No, Your Honor, that's not what I'm suggesting. What I'm saying is that the prior art in an obviousness rejection shouldn't have to show more than the applicant is showing to get his patent. It sounds as though it's the same thing that I'm saying, that if you could get a patent based on this for these claims, then that would render it obvious. Never mind, if you don't understand what I'm saying. I think that's what Dr. Miller is trying. In some ways, I think Dr. Miller is trying to say this, that maybe we are cross communicating. The simple point is that those sort of factual disputes about whether there would be graft versus host disease or host versus graft disease, or whether you would see regression of tumor cell growth or successful cancer treatment, he's arguing that those things are required to show reasonable expectation of success for the prior art to render these claims obvious. What he's asking for is that the prior art actually tested the claimed invention, and not only tested the claimed invention, that would be anticipation, but tested the claimed invention and found positive results. He's really asking for novelty plus. Those things that he says are material, really aren't material to the question before the court. The court did find that there were no material, at A12, there were no material factual disputes that would preclude summary judgment. With respect to the motivation combined and the other differences... Isn't teaching away a question of fact? Doesn't Miller take a position that there's teaching away? How do you respond to that? I want to make sure that we're talking about the same thing. Dr. Miller appears to say, oh look, there are all these differences between T cells and NK cells and TL cells and NK92...TL104 cells and NK92 cells. Oh, they have different cell surface receptors. One uses MHC, the other one doesn't. I thought the teaching away argument was based on the notion that it might cause disease in the patient, and that he's abandoned that argument this morning. Okay. Is that also your question? Well, everything he has in his declaration, there's quite a bit in there about the differences, and also about how one of ordinary skill in the art might be reluctant to do this because of the reasons of the graft disease and whatnot. Again... And because it's a question of fact, that would be a concern. You've generally talked about Mr. Miller's declaration and how it doesn't create a general issue of material fact because it's not material, but you have a specific response on this teaching away point. If we're talking about the host versus graft disease and graft versus host disease allegedly causing a teaching away, there's no dispute that those things might happen. So there's not an issue there. We're in agreement those things might happen. The issue is whether those things are material to the question before the court. You think somebody would give it a try anyway, given the teachings in his own prior reference? Right, because there are only these two types of cells that recognize and lyse cancer cells. If it's true then, it's true now. And because we've already seen T cell line, the TL104 cells that worked in vivo and ex vivo, and we already saw that NK92 cells work in vitro and ex vivo. The next logical step, and this was recognized by the Yen reference, the next logical step is go ahead and test it in an animal and see, does it really work? And that would be the next step is to test it, and that's anticipation. Obviously, Yen had the idea that this was the way to go, and I would assert that in the Klingman's abstract that he published with the ex vivo purging studies, that's where he was going. Because these things do proceed, the testing proceeds along a sort of normal path. You go from in vitro with cancer cell lines, to in vitro with primary tumor cells, to ex vivo, to in vivo in animals, and then in vivo in humans. There's no dispute that that's how these things happen. And all those facts that Dr. Miller says leads to a teaching away or no reasonable expectation of success, those things all relate to what we don't know for sure with 100% accuracy, that if you put these in humans, these bad things aren't going to happen. How do you distinguish the Ganga-Haram case, I don't know if I'm saying that correctly, where we reverse the board's obviousness finding because the prior art cautioned about predicting that something that was used in vivo could be used in vitro, or I think I put them reversed. What I would say is the facts of that case are different than the facts here. The facts here are that NK cells, not a cell line, but in the LAC studies that were conducted in the 1980s, had shown that NK cells do recognize in N life tumor cells, and successfully so, with renal tumors and melanoma tumors, that they do that in vivo. And so here there's much more evidence that would lead someone of ordinary skill of the art to believe. You're saying the hosts own cells, we know that the hosts own cells do that, is that what you're saying? Like the person's NK cells in vivo. I thought that it was established that prior to this invention, there were no foreign NK cells that were input in. Correct, Your Honor, and thank you for making that clear, if I hadn't done so. Yes, these are the patient's own NK cells. These have been shown by Dr. Rosenberg and others, that if you activate those NK cells, just like Vujetovic had found, that those NK cells would then go out and recognize N life tumor cells. You could do that either in vivo, where you just give interleukin-2 to activate the cells to the patient, and you cause the NK cells to respond this way, or you could take the patient's blood cells out, and then add the IL-2, that's called ex vivo, and then put it back into the patient. And now those cells would go on to recognize N life cancer cells. And that that was successful in treating renal carcinoma and melanoma. It was found, however, that the IL-2, which the claims on appeal permit as well, if you do a lot of that, the IL-2 will be cytotoxic to cells, but the fact remains that NK cells in vivo will recognize N life tumor cells. And again, there's all of this evidence about what T cells and NK cells, and TL-104 cells and NK-92 cells, about their ability to recognize N life cancer cells. And all of the sort of other differences between how they recognize N life cancer cells don't matter, in facing the fact that they do recognize N life cancer cells. The fact that they may do it through different mechanisms, it doesn't change the fact that they have this proven ability, and that proven ability would recommend to a person with ordinary skill in art, let's go try this in vivo. And that's a reasonable expectation of success. An unreasonable expectation of success is, hey, you've got to test it. Not only do you have to test it, you have to show it's safe and effective, and that nothing is going to go wrong. That's not the right standard. And so Dr. Miller's ultimate opinion on the reasonable expectation of success, and the facts he brings forward to support that, just do not make a material dispute. And the same is true for all of the differences between the cells that he discusses, that were also discussed before the board and the examiner, and rejected by the board and the examiner. Thank you. Thank you. Just three quick points. I just want to be clear about the significance of your answer to my earlier question. My understanding was that you were saying we're not relying on the teaching away because of the risk of spreading disease. So I thought I was answering a different question, which was whether the claim encompasses modified NK92. So your witness said it required that they be unmodified. That's not correct, right? In terms of what the claim requires, that's correct. But we're not abandoning teaching away. What he said is not correct, right? I agree with that, Your Honor. So if he made a wrong claim construction in that respect, then why should we pay any attention to what he said about the risk of spreading disease? Well, because it goes to the difference between these two cell lines. So example two of Santoli, the Santoli patent, shows that the unmodified tall 104 spread disease when engrafted in mice. I don't think you're answering my question. My question is, he said there's a risk of spreading disease because you have unmodified cells. He's wrong about the claim construction, so why should we pay attention to that? Well, because it's another example of a difference between these two cell lines. I don't understand what you're saying. I don't think you're addressing my question. If the risk of spreading disease only exists with respect to unmodified cell lines, in other words, not treated by radiation or whatever, and the claims don't require unmodified cell lines, why do we worry about the spreading of disease? Well, so the district court said these were functionally similar cell lines. There are a number of differences between them. You don't seem to be addressing my question. My question is, why should we pay any attention to the risk of spreading disease if he's got the wrong claim construction, and there's no question that you can irradiate the cells and prevent the spreading of disease? I agree with Your Honor that that's not relevant for the claim language, but it is relevant still scientifically because it speaks to another difference between these claims, between these cell lines. Now, we're not abandoning a teaching away argument. Just to give you one example, Santoli herself teaches away from the notion that in vitro results are a reliable indicator of in vivo results. Her own data shows this, and this is at JA220. Counsel's suggestion that, well, as long as you have in vitro results, then one is, well, just try in vivo, and that's enough to render a claim such as this to a method of treatment in vivo obvious. Well, that's a very sweeping proposition, and the In Re Ganderholm case that was referenced earlier, the In Re Carroll case, are both contrary to that. This is a question that turns on facts. Whether on the facts of this case, the gong in vitro results would have given a person of ordinary skill a reasonable expectation that NK92 could successfully be used in an in vivo therapy. There are just many disputed facts concerning that, including the very big differences between these two cell lines that the district court ignored. Thank you. Thank you. We thank both sides, and the case is submitted.